**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | |
|---|---|
| STATE OF WASHINGTON, | No. 84980-8-I |
| Respondent, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| THOMAS OSCAR CADY, | |
| Appellant. | |

FELDMAN, J. — Thomas Oscar Cady appeals his convictions for second degree felony murder and second degree identity theft and argues we should reverse and remand for a new trial due to the erroneous admission of unauthenticated surveillance videos,[1] ineffective assistance of counsel, the erroneous admission of irrelevant testimony regarding the victim's family, prosecutorial misconduct, and cumulative error. Cady also raises several issues in a statement of additional grounds for review. We affirm.

I

On May 24, 2020, at approximately 4:20 p.m., Katelyn Burleigh witnessed a violent altercation between two "black males" in the intersection of North 130th

---

[1] Unless the context indicates otherwise, we use the phrase "surveillance videos" herein to refer to and include the original videos as well as still images and short video clips produced from the original videos.

Street and Aurora Avenue North in Seattle. According to Burleigh, the aggressor was young, thin, and wearing a white coat, and the victim was older, heavier, moving slower, and wearing red. The altercation lasted less than 30 seconds, after which the aggressor ran towards a blue-gray sport utility vehicle (SUV) while carrying a black handgun, got into the driver's seat, and drove away. Burleigh immediately called 911 to report the altercation to law enforcement.

Seattle Police Department (SPD) Officers Steve Kim and Caroline Oskam arrived at the scene and spoke with Charles Johnson, a man in his early 60s who matched Burleigh's description of one of the men involved in the altercation. Johnson was wearing a white puffy jacket, a red t-shirt, and blue jeans. After speaking with Johnson, the officers believed he had been the victim of a robbery.

Later that same day, at approximately 6 p.m., Johnson was involved in another, this time fatal, altercation outside of K-Smoke Mart near the intersection of North 117th Street and Aurora Avenue North. Bryan Wunder was driving his vehicle when he saw someone stabbing another person on the side of the road. According to Wunder, the assailant was a shorter man who was "Mexican looking" and blonde, and the victim was a "black, older, like 50 year old guy" who was "tall." Wunder observed the assailant carrying a black knife with a blade measuring about three inches long. Wunder saw the victim fall backwards into the street, stand back up, and then pull down his pants to reveal blood "shooting out" of his "femoral area." Wunder called 911 to report the incident to law enforcement and watched the assailant flee towards a nearby Home Depot.

Several first responders arrived at the K-Smoke Mart minutes later to find Johnson lying on the ground in a pool of blood. Despite their efforts to save

2

Johnson's life, he bled to death shortly after their arrival. An autopsy later determined Johnson was killed by multiple stab wounds to his chest and right thigh delivered by a sharp blade, likely a knife. The fatal blow was a cut to his femoral artery in his right leg, which caused Johnson to lose a large amount of blood quickly and die within minutes. Officers attempted to gather information from several nearby witnesses who had observed the stabbing, but most of these witnesses were unwilling to assist with the investigation.

As part of the investigation into Johnson's death, SPD Detectives Donald Witmer and Donna Stangeland went to nearby businesses to search for surveillance footage that may have captured the attacks on Johnson. One of these businesses was the K-Smoke Mart, which had a surveillance system that detectives believed captured the second attack on Johnson. This footage (the K-Smoke Video) depicts a person in a light gray hooded jacket, light colored pants, and black shoes approach another person wearing a white coat, red shirt, and dark pants outside of the K-Smoke Mart. After several minutes of conversation, the person in the red shirt empties their pockets and is then attacked by the person in the light gray jacket. The victim falls backwards onto the road while the attacker repeatedly thrusts his right arm towards the victim. The victim then stands up, looks down at his right leg, and collapses near the road. As the attacker walks away, several bystanders come to aid the victim while he is lying on the ground.

The detectives also discovered surveillance footage at the Home Depot near the K-Smoke Mart, where Wunder saw the assailant flee after stabbing Johnson. This footage (the Home Depot Video) shows a person in a gray hooded sweatshirt with a black logo on the chest, light colored jeans with blue patches,

black shoes, a red baseball cap, and a face mask/respirator running through the Home Depot parking lot on the afternoon of May 24, 2020.

The detectives then discovered surveillance footage from Elliott Bay Auto Brokers that they believed captured the first attack on Johnson in the intersection of North 130th Street and Aurora Avenue North. This footage (the Elliott Bay Video) shows a person in a light colored hooded jacket, light colored pants, and dark colored shoes emerge from a gray SUV stopped in traffic. The person then runs toward another person walking on the sidewalk wearing a white coat and dark pants. The attacker chases the victim around the middle of the intersection while swinging his arms at the victim. The attacker then returns to the SUV and drives away.

The detectives identified Cady as a suspect through their investigation. After the first attack, Johnson told Kim and Oskam that he recognized his attacker as a man who used to live in room 8 of the nearby Emerald Motel and had previously stolen Johnson's bicycle. Upon speaking to the motel's managers, the officers learned that this former resident of room 8 was Cady. Then, after searching a database for pawn shop transactions, Witmer learned Cady had made a transaction at Don's Pawn Shop in Federal Way on the day before the stabbing. He and Stangeland visited the pawn shop and obtained a pawn receipt confirming Cady had visited the shop on May 23, 2020. The detectives also viewed surveillance footage from the pawn shop showing Cady arriving in a blue-gray SUV (which resembled the vehicle driven by Johnson's assailant in the Elliott Bay Video) and wearing a gray hooded sweatshirt with a black logo on the chest, light colored jeans with blue patches, black shoes, a white baseball cap, and a face

mask/respirator (which resembled the outfits worn by Johnson's assailant in the Elliott Bay and K-Smoke Videos and by the person in the Home Depot Video). Stangeland then distributed a bulletin to law enforcement agencies advising officers to detain Cady if located.

About a week after the stabbing, Washington State Trooper Logan Swift stopped Cady for speeding while driving east on I-90 about 100 miles from Seattle. Swift immediately recognized Cady from Stangeland's bulletin. Cady provided Swift with an identification card belonging to a different person. After detaining Cady, Swift discovered a red-handled Craftsman folding knife in his pocket, and officers later found a second small folding knife in the vehicle.

The State charged Cady with (1) first degree premeditated murder, (2) second degree felony murder based on the predicate offense of second degree assault, and (3) second degree identity theft. The jury found Cady guilty of (1) first degree manslaughter, as a lesser included offense of first degree premediated murder, (2) second degree felony murder, and (3) second degree identity theft. The jury also found by special verdict that Cady was armed with a deadly weapon during the commission of the crimes in counts 1 and 2. At sentencing, the court vacated the manslaughter conviction on double jeopardy grounds and imposed a high-end standard-range prison sentence of 445 months on the remaining counts, which includes a 48-month enhancement for the use of a deadly weapon. Cady appeals.

II

**A. Surveillance videos**

Cady argues the trial erred by "admitting surveillance video from the K-Smoke Mart and the Elliott Bay Auto Shop because the prosecution failed to sufficiently authenticate those videos." We disagree.

Under ER 901(a), a party may authenticate an exhibit through "evidence sufficient to support a finding that the matter in question is what its proponent claims." "The bar for authentication of evidence is not particularly high," and the proponent does not need to "rule out all possibilities inconsistent with authenticity." *State v. Hillman*, 24 Wn. App. 2d 185, 191, 519 P.3d 593 (2022) (quoting *United States v. Gagliardi*, 506 F.3d 140, 151 (2nd Cir. 2007)). We review a trial court's rulings on authenticity for an abuse of discretion, which occurs when the decision is manifestly unreasonable or exercised on untenable grounds or for untenable reasons. *State v. Payne*, 117 Wn. App. 99, 110, 69 P.3d 889 (2003).

The standards for authenticating video recordings are the same as those for photographs: the proponent must present witness testimony giving "some indication as to when, where, and under what circumstances" the video was taken and that the video "accurately portrays the subject illustrated." *State v. Sapp*, 182 Wn. App. 910, 914, 332 P.3d 1058 (2014) (quoting *State v. Newman*, 4 Wn. App. 588, 593, 484 P.2d 473 (1971)). A proponent may authenticate a video of a crime scene by calling a witness with personal knowledge of the scene the video depicts who can verify that the video accurately portrays the scene. *State v. Jackson*, 113 Wn. App. 762, 766, 54 P.3d 739 (2002). The proponent can also authenticate a video by calling the videographer or someone else with equivalent knowledge to

describe the equipment that was used, explain where and how it was used, and confirm that it generally produces accurate videos, that it produced the particular video in question, and that the video has not been altered since it was developed. *Id.*

Here, the State authenticated the K-Smoke Video and Elliott Bay Video through several witnesses. First, the State presented eyewitness testimony from the 911 callers who observed the attacks on Johnson on May 24, 2020. As to the K-Smoke Video, the State showed still images from the original video to Wunder, who recognized the location and people depicted in the images and testified that "it definitely was the two of them that I saw." Wunder agreed that he has not "seen anything at all like that . . . at that location" before or after the incident. Wunder could also identify the truck he was driving in the photographs. The State also elicited detailed testimony from Burleigh describing the events surrounding the first attack on Johnson outside of Elliott Bay Auto Brokers, including the location, date, and behavior of the two men engaged in the altercation. The time stamp in the Elliott Bay Video indicates that this altercation occurred at 4:22 p.m., which was just before Burleigh called 911 and Kim and Oskam were dispatched to the scene. Moreover, the Elliott Bay Video appears to capture Burleigh's vehicle driving away from the scene like she described in her testimony. These eyewitness recollections of the attacks on Johnson largely correspond with the events depicted in the videos.

Second, Travis Smith, an SPD employee trained in video forensics, described how he collected the videos from the stores' surveillance systems. Smith testified that he could interact and was familiar with the type of surveillance

system used at K-Smoke Mart because it was a "machine that . . . I had worked with before." Smith also testified that the camera appeared to accurately record the area where the stabbing occurred outside of K-Smoke Mart, that the date stamp on the video is accurate, and that, although the time stamp on the video is approximately 12 minutes fast, he was able to successfully locate the portion of video depicting the second attack on Johnson on May 24, 2020 based on a time frame provided by detectives.[2] Smith gave similar testimony about extracting the video from Elliott Bay Auto Brokers' surveillance system, which Smith likened to K-Smoke Mart's system. Smith also testified that the surveillance videos introduced at trial are fair and accurate copies of the videos he obtained from K-Smoke Mart and Elliott Bay Auto Brokers and that the events depicted in the videos have not been altered or changed.

Third, Mike Mellis, an SPD forensic video technician, described the process by which he produced still images and shorter video clips from the original surveillance videos that focus on the activity of interest depicted in the videos. Mellis created these images and video clips by upscaling (i.e., zooming in on) the activity of interest and cropping (i.e., removing) contents on the periphery of the images. Some of Mellis' video clips also play the original videos at a slower frame rate. But Mellis clarified that his production work does not alter or change "[t]he content and the motion of people and objects in the video." He also testified that

---

[2] Cady argues that Smith's testimony did not authenticate the videos because he "relied on a chain of hearsay information in terms of attempting to identify what time frame to search for in the video system." This argument is unconvincing because a court is not bound by the rules of evidence when determining authenticity and, thus, may consider hearsay in making this decision. *State v. Williams*, 136 Wn. App. 486, 500, 150 P.3d 111 (2007) (citing ER 104(a); ER 1101(c)(1)).

the images and video clips introduced into evidence are fair and accurate copies of the ones he produced from the original surveillance videos.

Fourth, Witmer described how he discovered during his investigation that K-Smoke Mart and Elliott Bay Auto Brokers had surveillance systems that captured the attacks on Johnson. He testified that he oversaw Smith's extraction of the surveillance videos from these stores shortly after the stabbing. Witmer further testified that the discs introduced into evidence by the State contain fair and accurate copies of the videos Smith extracted from K-Smoke Mart and Elliott Bay Auto Brokers. Lastly, Witmer testified that the images and video clips produced by Mellis that were included on the discs fairly and accurately depict the contents of the original videos (other than being upscaled, cropped, or played in slow-motion).

On this record, the State presented evidence sufficient to support a finding that the surveillance videos are what the State claims. As recounted above, the State elicited testimony from eyewitnesses who observed the events depicted in the videos and from witnesses with knowledge of how the stores' surveillance systems accurately produced the videos in question. See *State v. Tatum*, 58 Wn.2d 73, 75, 360 P.2d 754 (1961); *Jackson*, 113 Wn. App. at 766. Because this testimony sufficiently indicated when, where, and under what circumstances the surveillance videos were taken and that they accurately portray the subjects illustrated, the trial court did not abuse its discretion in determining the State met its minimal burden to authenticate the videos.

Notwithstanding the foregoing analysis, Cady argues the State failed to authenticate the surveillance videos because none of its witnesses both (a) personally witnessed the events in question and (b) knew how the videos were

created and extracted. But Washington courts allow the proponent to authenticate a video through the combined testimony of multiple witnesses who each possess some knowledge of the events depicted on the video or how the video was created. See *Tatum*, 58 Wn.2d at 75 (photograph of forged check authenticated through testimony of store employee who processed the check and testimony of camera manufacturer employee about how the camera accurately photographed the check). Moreover, a witness can authenticate a video even if they were not the videographer and were not present at its recording. *Sapp*, 182 Wn. App. at 914-15. The combined testimony of Wunder, Burleigh, Smith, Mellis, and Witmer provided ample evidence of the authenticity of the K-Smoke and Elliott Bay Videos.

Cady did not present evidence at trial seriously undermining the authenticity of the surveillance videos, and *State v. Wisner*, No. 46597-3-II (Wash. Ct. App. Mar. 1, 2016) (unpublished), https://www.courts.wa.gov/opinions/pdf/D2%2046597-3-II%20Unpublished%20Opinion.pdf, which he cites on appeal, does not support his argument. In *Wisner*, the defendant was charged with identity theft after he allegedly filled out a deposit slip at a bank to withdraw funds from another person's account. *Id.* at 1. The State sought to introduce surveillance video and still photos purportedly depicting the defendant interacting with the bank teller. *Id.* at 2-3. But at trial, the teller could not identify the person in the video as the same man who represented himself as the account owner. *Id.* The teller revealed that her knowledge of what the video depicted was based entirely on information provided to her by the State. *Id.* The teller also was not responsible for maintaining the security department's videos and had "no clue" whether the date and time shown on the video were correct. *Id.* On appeal, the court held that the teller's

"inability to recall the transaction at all or testify as to whether the video was actually the . . . transaction is insufficient to authenticate the video." *Id.* at 8-9.

*Wisner* is readily distinguishable. Unlike the teller in Wisner, who had no recollection of the transaction shown in the video, Wunder testified at Cady's trial that the images taken from the K-Smoke Video accurately depict the attack on Johnson that he witnessed. Burleigh's testimony about the first attack on Johnson is also largely consistent with what the Elliott Bay Video depicts. And whereas the State in *Wisner* "provided no other witness testimony as to the process of the surveillance camera" (*id.* at 8), in Cady's trial the State presented multiple witnesses to explain how the surveillance videos were extracted from the stores' security systems and accurately reproduced for trial. Lastly, the record does not indicate that any testimony from an authenticating witness at Cady's trial was based "entirely on information provided to [them] by the State." *Id.* at 8-9. Thus, *Wisner* is inapposite

At bottom, Cady's authentication argument asks us to reverse his convictions because the surveillance videos do not conclusively prove that he is the person depicted in the videos. But this is not the relevant inquiry in the authentication analysis. Once the State presented some indication as to when, where, and under what circumstances the videos were taken and that they accurately portray the subject illustrated, "the question of the identity of the person in the videotape[s] was a question of fact" that was "left to the jury to decide." *See State v. Sexsmith*, 138 Wn. App. 497, 508-09, 157 P.3d 901 (2007). The jury had the opportunity to view for themselves both the K-Smoke Video and the Elliott Bay Video and determine, based on the 911 callers' descriptions of Johnson's attacker

11

and the other evidence admitted at trial, whether Cady was the assailant in those videos. The trial court did not err in concluding that the surveillance videos were properly authenticated and allowing the jury to determine whether the videos show that Cady committed the crimes at issue.

## B.     Ineffective assistance of counsel

Cady argues that his trial counsel was ineffective for not interviewing two eyewitnesses to Johnson's stabbing, David Parra Castro and Gustavo Alvarado, and not compelling their attendance at trial. We disagree.

A defendant alleging ineffective assistance of counsel must satisfy the two-prong *Strickland* test by showing that (a) "counsel's performance was deficient" and (b) "the defendant was prejudiced by the deficient performance." *In re Pers. Restraint of Crace*, 174 Wn.2d 835, 840, 280 P.3d 1102 (2012) (citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)). A defendant satisfies the deficiency prong by establishing that "counsel's performance fell below an objective standard of reasonableness in light of all the circumstances." *In re Pers. Restraint of Lui*, 188 Wn.2d 525, 538, 397 P.3d 90 (2017). To overcome the strong presumption that counsel's performance was reasonable, the defendant must show that no legitimate trial tactic can explain counsel's performance. *Id.* at 539. On direct appeal from a conviction, we determine counsel's competency "based on the record established in the proceedings below." *State v. McFarland*, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995).

We generally presume that a lawyer's decision not to call a particular witness is a legitimate trial tactic. *In re Pers. Restraint of Davis*, 152 Wn.2d 647,

742, 101 P.3d 1 (2004). This presumption can be overcome by showing that counsel "failed to conduct appropriate investigations to determine what defenses were available, adequately prepare for trial, or subpoena necessary witnesses." *Id.* To prove deficiency under a "failure to investigate" theory, the defendant must show "a reasonable likelihood that the investigation would have produced useful information not already known to defendant's trial counsel." *Id.* at 739. Counsel's duty to investigate "does not necessarily require that every conceivable witness be interviewed." *Id.* (quoting *Bragg v. Galaza*, 242 F.3d 1082, 1088 (9th Cir. 2001)). Moreover, the defendant must show that the allegedly helpful witnesses were available and specify the content of the testimony they would have provided. *Id.* at 740. We can defer to a trial lawyer's decision not to conduct a particular interview or call a particular witness so long as the lawyer "investigated the case and made an *informed* and reasonable decision." *State v. Jones*, 183 Wn.2d 327, 340, 352 P.3d 776 (2015).

Here, Cady fails to meet his burden of showing, based on the record established in the proceedings below, that his counsel performed deficiently by not interviewing Castro and Alvarado and not compelling their testimony at trial. As to Castro, the record does not support Cady's claim that his counsel knew of Castro's existence or that he was available to be interviewed or called as a witness at trial. While Cady's appellate attorneys allege that a police report disclosed during discovery identifies Castro as an eyewitness to the stabbing, the record on appeal contains no such document. The only evidence in the record pertaining to Castro comes from Cady's affidavit signed seven months after trial (which the trial court did not find credible) in which he claims for the first time that Castro "was a direct

13

eye witness to this incident" and that Cady knew Castro from occasional contacts in the neighborhood. But Cady does not specify the content of the testimony Castro would have provided had he been called as a witness. Moreover, Castro's testimony could have further incriminated Cady by identifying him as the attacker. On this record, Cady fails to show that his attorney's decision not to interview or call Castro as a witness was uninformed and unreasonable.

Cady also fails to make this showing with respect to Alvarado. The record shows that Alvarado gave two interviews to police before trial detailing his eyewitness account of the stabbing. In the first interview, Alvarado said that Johnson's attacker matched the description of a man he had previously seen earlier that morning on the bus. Alvarado told police that the man on the bus showed Alvarado a picture of Johnson, asked Alvarado if he knew Johnson, and said, "If I see him, he's going to have problems." Alvarado described the man on the bus as a White, blue-eyed man between 26 and 28 years old who was shorter than 5'11'' in height and had long brown hair. Alvarado said he had never previously met the man on the bus, but he also stated he could not see the face of the man on the bus or the face of Johnson's attacker because they were both wearing face masks.

During his second interview, Alvarado gave a similar description of the man on the bus as weighing approximately 160 pounds and dressed in "all white," but this time Alvarado said the man was between 30 to 40 years old and approached Alvarado at the bus stop instead of on the bus. When police showed Alvarado a still image of the attacker taken from the K-Smoke Mart Video, Alvarado said it was the same man who approached him at the bus stop. After giving these interviews,

Alvarado stopped communicating with law enforcement and could not be located for trial. After the trial, Cady's new attorneys hired an investigator to locate Alvarado (who was unhoused at the time of his interviews with police), but the investigator was also unsuccessful in contacting Alvarado.

As with Castro, Cady fails to show that Alvarado was available for trial, given that both the State and Cady's new attorneys were unable to contact him. Even if Cady's counsel could have located Alvarado, it does not appear that interviewing him would have necessarily uncovered new information helpful to Cady. While Cady claims that Alvarado would have recognized him from previous encounters, Alvarado also told police that he could not see the face of Johnson's attacker or the face of the man at the bus stop. Moreover, Alvarado's description of the man at the bus stop resembles Cady, who is also a White man with blue eyes weighing approximately 160 pounds. Indeed, Cady's affidavit states he "ran into" Alvarado "at the bus stop[] in the weeks prior to the stabbing." On this record, Cady's trial counsel was not deficient in declining to interview Castro or Alvarado or call them as witnesses.

But even if Cady's trial counsel was deficient in this regard, Cady has failed to show prejudice. To prevail under the second *Strickland* prong, Cady must establish that "in the absence of counsel's deficiencies, there is a reasonable probability that the result of the proceeding would have been different." *Lui*, 188 Wn.2d at 538. As stated above, had counsel been able to locate Castro and Alvarado and call them as witnesses, both of them could have further incriminated Cady by identifying him as Johnson's attacker. Because Cady has not shown a

reasonable probability that Castro's or Alvarado's testimony would have produced a different result at trial, Cady's ineffective assistance of counsel argument fails.

## C.      Testimony regarding the victim's family

At trial, the State called Johnson's daughter, Ebony Nealy, as a witness to prove that Johnson was the victim of the charged crimes.  The State presented Nealy with Johnson's driver's license, and Nealy identified the person in the photo on the license as her father.  Nealy further testified about her relationship with Johnson and stated that she stopped communicating with him four or five years before trial.  Cady's counsel objected to "the relevance of this line of questioning," and the trial court overruled the objection.  Cady argues this testimony was irrelevant and prejudiced him by "enflame[ing] the jurors' emotion and compassion" against Cady.  We disagree.

Evidence is admissible only if it is relevant, meaning it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  ER 401, 402.  The threshold for relevancy is "very low," and even "minimally relevant evidence is admissible."  *State v. Darden*, 145 Wn.2d 612, 621, 41 P.3d 1189 (2002).  We review a trial court's evaluation of relevance "with a great deal of deference" under a manifest abuse of discretion standard of review.  *State v. Luvene*, 127 Wn.2d 690, 706-07, 903 P.2d 960 (1995).  Even if the trial court erroneously admitted irrelevant evidence, such error is harmless and not reversible

if "within reasonable probability, it did not materially affect the verdict." *State v. Hawkins*, 157 Wn. App. 739, 752, 238 P.3d 1226 (2010).

Here, Nealy's testimony regarding her relationship with Johnson and her family was relevant to satisfy an element of the crimes charged in counts 1 and 2, namely the identity of the victim. To convict Cady of first degree murder as charged in count 1 and of second degree murder as charged in count 2, the State had to prove that Cady "cause[d] the death of Charles Johnson." Nealy's identification of Johnson's driver's license and description of their relationship was relevant to establish how Nealy knew the man depicted in the driver's license photograph (who the State would later argue was the same man Cady stabbed outside of the K-Smoke Mart) was her father. Further, Nealy's testimony about her relationship with Johnson was relevant to explain why she stopped communicating with him and how she still knew what he looked like. For these reasons, the trial court did not abuse its discretion in overruling Cady's objection.

But even if this testimony was irrelevant, it was harmless. Nealy's brief testimony about her relationship with Johnson was of minor significance to the evidence of Cady's guilt. Moreover, the jury instructions reminded the jury, "You must not let your emotions overcome your rational thought process. You must reach your decision based on the facts proved to you and on the law given to you, not on sympathy, prejudice, or personal preference." We presume the jury followed this instruction and did not convict Cady based on an emotional response to Nealy's testimony. *See State v. Kirkman*, 159 Wn.2d 918, 928, 155 P.3d 125 (2007). Thus, Cady's relevance argument fails.

17

### D.    Prosecutorial misconduct

When Nealy testified regarding her relationship with her father, she also began to testify about her own daughter.  When that occurred, Cady's counsel objected to this line of questioning, stating "I don't believe it's relevant."  The prosecutor responded, "I believe that it's relevant to Mr. Johnson's family."  Cady's counsel did not object to or move to strike the prosecutor's response.  Nonetheless, Cady now argues that the prosecutor committed misconduct by calling Nealy as the first witness and implying, through the foregoing response to defense counsel's objection, that he represented Johnson's family.  We disagree.

To prevail on a prosecutorial misconduct claim, the defendant must show the prosecutor's conduct was both improper and prejudicial.  *State v. Emery*, 174 Wn.2d 741, 756, 278 P.3d 653 (2012).  Where, as here, the defendant did not object on prosecutorial misconduct grounds to the alleged misconduct, the defendant must show "the misconduct was so flagrant and ill-intentioned that (1) no curative instruction would have obviated any prejudicial effect on the jury and (2) the resulting prejudice had a substantial likelihood of affecting the jury verdict."  *State v. Mireles*, 16 Wn. App. 2d 641, 656, 482 P.3d 942 (2021).  A prosecutor acts improperly by "seeking a conviction based on emotion rather than reason."  *State v. Craven*, 15 Wn. App. 2d 380, 385, 475 P.3d 1038 (2020).  Moreover, a prosecutor acts improperly by stating that they represent the victim's family.  *State v. Pierce*, 169 Wn. App. 533, 558, 280 P.3d 1158 (2012).

Here, the prosecutor's argument that Nealy's testimony was "relevant to Mr. Johnson's family" was not "so flagrant and ill-intentioned that (1) no curative instruction would have obviated any prejudicial effect on the jury and (2) the

resulting prejudice had a substantial likelihood of affecting the jury verdict." *Mireles*, 16 Wn. App. 2d at 656. Cady contends the remark implied "that the prosecution was acting on behalf of the victim's family." But in the context of Nealy's testimony and the exchange between the prosecutor and defense counsel about the merits of defense counsel's objection, it appears just as likely that the prosecutor intended his statement to mean that Nealy's testimony was relevant to *establish the members of* Mr. Johnson's family, not to imply that Johnson's family deserved to hear the answer to the prosecutor's question or that the prosecutor somehow represented the family. And while Cady argues that "the prosecution's decision to call Nealy as the first witness was to place a family member of Johnson's in front of the jury to evoke an emotional response," Cady cites no authority suggesting that the order in which the prosecution calls its witnesses may give rise to a prosecutorial misconduct claim. *See State v. Loos*, 14 Wn. App. 2d 748, 758, 473 P.3d 1229 (2020) ("When a party provides no citation to support an argument, this court will assume that counsel, after diligent search, has found none.").

Nor has Cady shown, as he must, "that (1) no curative instruction would have obviated any prejudicial effect on the jury and (2) the resulting prejudice had a substantial likelihood of affecting the jury verdict." *Mireles*, 16 Wn. App. 2d at 656. To the contrary, any prejudicial effect could easily have been obviated by specifically instructing the jury that the prosecutor did not represent Johnson's family. *See Pierce*, 169 Wn. App. at 558 (statement that prosecutor represented the victims' families could have been cured by an objection from defendant). The trial court also instructed the jury not to decide the case based on sympathy or

emotion and that "the lawyers' statements are not evidence." This, too, obviated any conceivable prejudice. *See Craven*, 15 Wn. App. 2d at 390-91 (prosecutor's appeal to jurors' emotions was cured by court's instructions to not decide the case on sympathy, prejudice, or personal preference). Thus, we reject Cady's prosecutorial misconduct argument.

**E.      Cumulative error**

Cady argues that reversal is warranted under the cumulative error doctrine, which applies when several errors occurred below that, while individually harmless, combined together to deprive a defendant of a fair trial. *State v. Hodges*, 118 Wn. App. 668, 673-74, 77 P.3d 375 (2003). Because Cady has identified no trial errors, we decline to reverse under the cumulative error doctrine.

**F.      Statement of additional grounds for review**

Cady has filed a statement of additional grounds for review (SAG). The purpose of a SAG is "to identify and discuss those matters related to the decision under review that the defendant believes have not been adequately addressed by the brief filed by the defendant's counsel." RAP 10.10(a). Under RAP 10.10(c), we will not consider arguments raised in a SAG that do not inform us of "the nature and occurrence of alleged errors." Nor are we obligated to search the record in support of claims raised in a SAG, and we may only consider documents that are contained in the record on review.[3]  *Id.*  Cady's SAG is 52 pages in length and

---

[3] On April 19, 2024, after filing his SAG, Cady filed a "Motion to Add Documentation Already in the Record." We deny the motion. To the extent that the attached documentation is already in the record, as Cady represents, there is no reason to grant the requested relief. And to the extent that the documentation is not already in the record, the motion fails on the merits. *See* RAP 10.10(c) ("Only documents that are contained in the record on review should be attached or referred to in the" SAG.).

contains 11 argument headings, many of which include several intertwined arguments that are not clearly delineated. Having carefully reviewed each alleged error in the context of the case, the record, and the arguments as a whole, we reject the arguments raised in Cady's SAG for the reasons discussed below.

### 1. Cady's prior robbery conviction

Cady argues the trial court erroneously allowed the State to impeach him (had he testified) with his prior robbery conviction from 2000 because such evidence should have been excluded under ER 404(b). Before trial, the State filed a motion in limine to admit Cady's prior conviction pursuant to ER 609, which allows a party to introduce for impeachment purposes evidence that the defendant had been convicted of a crime involving dishonesty. ER 609(a). Cady objected to the admissibility of the prior conviction because "under [ER] 404(b) . . . I believe that the probative value is substantially outweighed by its prejudicial effect." The trial court rejected this argument and granted the State's motion.

Cady's ER 404(b) argument is misplaced because the State did not seek to use Cady's prior conviction as substantive evidence but rather for impeachment purposes under ER 609. *See State v. Jackson*, 102 Wn.2d 689, 694, 698 P.2d 76 (1984). Also, a trial court is not required under ER 609 to balance the probative value of a prior conviction against its prejudicial effect when the conviction involves dishonesty and is not more than 10 years old. *State v. Russell*, 104 Wn. App. 422, 433-34, 16 P.3d 664 (2001). Robbery is a crime of dishonesty, *State v. Rivers*, 129 Wn.2d 697, 705, 921 P.2d 495 (1996), and the record shows Cady was released from the confinement imposed for his robbery conviction fewer than 10 years before his trial began.

**2.     Double jeopardy**

Cady argues his convictions are barred by double jeopardy due to misconduct by the State in delaying his trial for several months. The record indicates that after Cady's jury trial commenced in September 2021 but before jury selection was completed, the trial court recessed and/or stayed the trial in October 2022 after the prosecutor suffered a medical emergency requiring him to take an extended leave of absence. The trial then resumed in February 2022 with a new prosecutor, and the parties restarted the jury selection process. In support of his double jeopardy argument, Cady cites two cases discussing circumstances in which double jeopardy prevents a retrial after the government's misconduct forces a mistrial. *See State v. Lewis*, 78 Wn. App. 739, 898 P.2d 874 (1995); *Oregon v. Kennedy*, 456 U.S. 667, 102 S. Ct. 2083, 72 L. Ed. 2d 416 (1982). Because that did not occur here, Cady's double jeopardy argument fails.

**3.     Admission of knives**

Cady argues the trial court erred in denying his motion to suppress the two knives found in his car. Relatedly, Cady argues his counsel was ineffective for not filing a motion to suppress the knives before trial.

At trial, the prosecutor indicated he would elicit testimony regarding forensic testing of the two knives found in Cady's car and photographs of the knives. Cady moved to exclude any evidence pertaining to these knives because they had "not been forensically connected to this case" and would confuse the jury and unfairly prejudice him. The prosecutor responded that the knives were relevant because one of the knives (the Craftsman folding blade) partially matched Wunder's description of the knife used to stab Johnson and could have been cleaned before

Cady was apprehended. The prosecutor also argued that Cady should have raised his arguments before trial, to which Cady's counsel responded, "if [the prosecutor] wants to make a record that I'm ineffective, and that the Court doesn't want to have this argument, then I will say that I'm ineffective."

The trial court denied Cady's motion to suppress the Craftsman folding blade but granted his motion to suppress the other knife. The next day, Cady's counsel mentioned that the knives could be inadmissible under ER 404(b), but clarified, "the Court's already made its ruling. I don't think I can relitigate that, especially on the basis of 404(b)." The trial court then granted defense counsel's request for the State to introduce the physical knives into evidence for completeness so counsel could contrast them with Wunder's description of the knife used to kill Johnson.

Cady's arguments on this topic fail for several reasons. Preliminarily, he has not preserved his ER 404(b) argument on appeal because his trial counsel did not timely raise an objection on that specific basis below. *See* RAP 2.5(a); *State v. Korum*, 157 Wn.2d 614, 648, 141 P.3d 13 (2006). To the extent Cady raises an ER 403 argument, which arguably was raised below, the trial court did not abuse its discretion in denying his motions to suppress this evidence on that evidentiary basis. *See Colley v. Peacehealth*, 177 Wn. App. 717, 723, 312 P.3d 989 (2013) (denial of motion in limine is reviewed for abuse of discretion). The Craftsman folding blade had probative value because it somewhat matched Wunder's description of the size of the knife used to kill Johnson, and Cady was able to undermine the evidentiary weight of these knives by illustrating how they differed from Wunder's description of the murder weapon. Similarly, Cady's counsel was

not ineffective for failing to file a pretrial motion to suppress the knives because counsel still had time to orally move to suppress the knives before they were admitted, and this motion was granted in part.

### 4. Dismissal of jury panel 3

Cady argues the trial court violated GR 37 by summarily dismissing jury panel 3 during jury selection without considering the race or ethnicity of the dismissed jurors. The record shows that during voir dire, some jurors asked whether Cady could receive the death penalty if convicted. After the prosecutor told the jurors they would not know if "the death penalty is going to apply," several jurors expressed discomfort at the idea of presiding over a death penalty case. The trial court later dismissed the entire panel "in an abundance of caution" because they were told information contrary to *State v. Pierce*, which held that jurors cannot be prohibited from knowing "whether they are being asked to sit on a death penalty case." 195 Wn.2d 230, 244, 455 P.3d 647 (2020). Cady objected under GR 37 because "[t]here are five jurors in that panel that you had struck that identify as a person of color," and the trial court overruled the objection. Cady's argument fails because the authority he cites pertains to a *party's* dismissal of a juror using a *preemptory challenge*. *See* GR 37; *Pierce*, 195 Wn.2d at 242-44. Here the *trial court* dismissed panel 3 *for cause* for a reason other than jurors' race or ethnicity.

### 5. Impeaching Stangeland using the Brady List

Cady argues the trial court abused its discretion by prohibiting him from impeaching Stangeland under ER 608 with evidence that she was on the *Brady*

list.[4]  ER 608(b) provides that a party may, in the discretion of the court, inquire into a witness' specific instances of conduct concerning the witness' character for untruthfulness if probative of untruthfulness.  Here, the record indicates that over a decade before trial, Stangeland had allegedly observed documents and listened to jail calls that were protected by attorney-client privilege.  The trial court excluded this evidence because "there hasn't been sufficient information that would support the record that any of the previous allegations of misconduct are relevant or material" to Cady's case.  Cady has not shown that this ruling was an abuse of the trial court's discretion.  *See State v. O'Connor*, 155 Wn.2d 335, 349, 119 P.3d 806 (2005) (in exercising its discretion in ruling on an ER 608 objection, the court "may consider whether the instance of misconduct is relevant to the witness's veracity on the stand and whether it is germane or relevant to the issues presented at trial").

**6.     Impeaching Wunder and Johnson using prior convictions**

Cady argues the trial court erred by preventing him from impeaching Wunder's and Johnson's credibility under ER 609 using their prior convictions.  Before trial, the court granted the State's motion in limine to exclude any alleged prior misconduct by the victim and witnesses under ER 608, ER 404, and ER 405.  Defense counsel "agree[d] that we're not going to elicit criminal convictions," but indicated he may impeach Johnson's credibility by referencing a "previous contact" between him and one of the officers involved in the investigation.  The trial court

---

[4] The *Brady* list refers to an internal document maintained by the prosecutor's office that identifies law enforcement officers with potential impeachment evidence that must be disclosed to the defense.  *See State v. Stotts*, 26 Wn. App. 2d 154, 158 n.1, 527 P.3d 842 (2023) (citing *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963)).

granted the State's motion but told the parties to ask for a sidebar if they "feel as though a door has been opened or some threshold has been crossed."

Cady fails to show how the trial court erred because he does not cite any instance in the record where he attempted to impeach Wunder or Johnson with their prior convictions or argued to the trial court, either before trial or during a sidebar, why he should be permitted to do so. Moreover, Cady's counsel was not ineffective for attempting to impeach Wunder in this manner because this decision could have been strategic. Cady's theory of the case relied heavily on Wunder's descriptions of the attacker and the murder weapon, and impeaching his credibility could have damaged this theory. As to Johnson, Cady provides no authority stating that a defendant may impeach the deceased victim's credibility by questioning other witnesses about their knowledge of the victim's prior contacts with law enforcement. And Cady fails to show how impeaching Wunder or Johnson with their prior convictions would have changed the outcome of trial.

### 7. COVID-19 social distancing procedures during trial

Cady raises two arguments relating to the trial court's use of social distancing during trial to mitigate participants' exposure to COVID-19. First, Cady argues the trial court erred by conducting jury selection over Zoom instead of in-person.[5] We reject this argument because the trial court reasonably decided to conduct jury selection remotely due to the "very serious health concerns that are created by this pandemic," and the court conducted the remainder of the trial in-person. This decision comported with the orders issued by the Washington

---

[5] Zoom is a cloud-based video conferencing software platform.

Supreme Court in effect during Cady's trial permitting trial courts to use remote proceedings when appropriate to further public health and safety. *See State v. Griffin*, ___ Wn. App. 2d. ___, 544 P.3d 524, 528-31 (2024) (no abuse of discretion in conducting resentencing hearing over Zoom pursuant to Supreme Court's emergency orders in effect during the COVID-19 pandemic).

Second, Cady argues the trial court should have declared a mistrial, and his defense counsel was ineffective for not making such a motion, after the trial court's socially-distanced seating arrangement allowed juror 4 to see a police report that was not admitted into evidence which displayed Cady's name and photograph. During questioning by the trial court outside the presence of the other jurors, juror 4 said he looked at the report but did not see anything other than the face of a "Caucasian" man that he could not recognize. Juror 4 also stated that he did not communicate this information to any other jurors. The trial court granted Cady's motion to excuse juror 4. Cady's argument that the trial court should have *sua sponte* declared a mistrial fails because he provides no authority suggesting that the trial court should have done so in this situation. Moreover, Cady has not shown prejudice because juror 4 was dismissed and did not discuss the police report with any other jurors, and Cady has not demonstrated how the jurors' seating arrangement prejudiced him in any other way.

### 8. Offender score

Cady argues the trial court erroneously calculated his offender score by counting four prior convictions separately instead of as a single offense because they encompassed the "same criminal conduct." Cady also argues his trial counsel was ineffective for not making this argument at sentencing. In calculating the

offender score, the sentencing court counts all prior convictions separately, except for "[p]rior offenses which were found, under RCW 9.94A.589(1)(a), to encompass the same criminal conduct," which "shall be counted as one offense." RCW 9.94A.525(5)(i). "Same criminal conduct" means "two or more crimes that require the same criminal intent, are committed at the same time and place, and involve the same victim." RCW 9.94A.589(1)(a).

The "criminal history" portion of Cady's judgment and sentence in this case indicates that on June 23, 2000, he was sentenced for the crimes of "possession of firearm," "assault 2," "robbery 1 w/firearm," and "escape 2." At Cady's sentencing hearing, the prosecutor said he calculated an offender score of 10 on count 2 and a score of 8 on count 3. The State then referred to its presentencing report (which is not included in the record on appeal) and stated that the report "provide[s] certified copies of court records from [Cady's] prior convictions in support of the state's calculation of Mr. Cady's offender score." Defense counsel responded, "I don't have argument regarding . . . what the state provide[d] today [to] the Court or the Court's calculation." And defense counsel's presentencing report (which is included in the record on appeal) does not identify Cady's prior convictions or argue that they encompassed the same criminal conduct. After reading both parties' presentencing reports, the sentencing court stated, "I do find that the state has proven Mr. Cady's criminal history by a preponderance of the evidence and sufficient evidence to establish that Mr. Cady's offender score for count 2 is one of 10 and for count 3 is one of 8."

On this record, Cady's first argument fails on waiver grounds due to his counsel's failure to argue that his prior convictions encompassed the "same

criminal conduct."  By declining to present any argument regarding Cady's prior convictions in response to the State's calculation of Cady's offender score, which counted the four prior convictions at issue separately, Cady's trial counsel represented to the trial court that the court did not need to conduct a same criminal conduct analysis with respect to these convictions.  *See State v. Bell*, 26 Wn. App. 2d 821, 842-43, 529 P.3d 448 (2023) (finding waiver of "same criminal conduct" argument where defense counsel agreed with State's offender score calculation). Cady's second argument likewise fails because, in the absence of further information regarding the underlying facts and sentencing determinations with respect to these four prior convictions, Cady cannot show based on the record established in the proceedings below that his attorney was ineffective in failing to argue that these prior convictions encompassed the same criminal conduct.

### 9.    Additional arguments

Cady's SAG also alleges that several other errors were committed below, including errors relating to the trial court's denials of his motion for a new trial and his motion to reconsider the denial of his motion for a new trial, his inability to attend the omnibus hearing, his trial counsel's failure to move for a change of judge based on alleged bias, the trial court's grant of the State's motion to amend the charging information, statements made by Johnson to Oskam and Kim that were admitted in violation of the Confrontation Clause (U.S. Const. Amend. 6), an additional instance of prosecutorial misconduct where the prosecutor allegedly intentionally elicited hearsay testimony from Oskam, and the trial court's denial of various post-sentencing motions regarding "violation of court procedure & rules" and restitution to the victim's family.  Many of these additional arguments overlap

with other SAG issues and fail for the reasons set forth above. The remaining arguments do not sufficiently inform us of the nature and occurrence of the alleged errors because they are vague, conclusory, and/or unsupported by citation to the record. We decline to consider such arguments. *See* RAP 10.10(c) ("[T]he appellate court will not consider a defendant's statement of additional grounds for review if it does not inform the court of the nature and occurrence of alleged errors.").

Affirmed.

Feldman, J.

WE CONCUR:

Smith, C.J.

Dwyer, J.